Thank you, Your Honor. May it please the Court to make good use of my time. What I'd like to do is begin by discussing the Americans with Disabilities Act claim and how that relates to the Court's decision to strike portions of the plaintiff's affidavit. Essentially, Your Honor, Judge Ashmanskas, the magistrate judge, decided that Ms. Gomez-Morales was not a qualified individual with a disability. By finding that she was able to perform the same major life activities that she was before she became ill with panic disorder as she was at the present time. However, Your Honor, that is not the definition and that is not the correct way under the law to look at this. The issue is whether or not Ms. Gomez-Morales was substantially limited in major life activities. Can I just ask for a clarification? Because one of the things in this case that it seems to be, I don't think I've seen this quite before, it seems like her symptoms persisted only with a supervisor at a location. When she went to other locations and other employers, she had no such symptoms and did not ask for any accommodation. Is it your position that a qualified person under the ADA can have symptoms related to a job and a location and still qualify if he or she is able to fully function without accommodation in any other setting? I don't, respectfully, Your Honor, I don't think that that's what the evidence in this case showed. I think the evidence showed that she continued to have substantial interference with things like sleeping, memory, concentration, etc. Yet she was able to perform the essential functions of the job of a dialysis technician. And she didn't ask, if I understand the record correctly, she did not ask for an accommodation at the other locations. Is that correct? She was able to successfully return to work for another employer. Right, but she did not ask for an accommodation. She didn't say, I'm having trouble sleeping, I can't do these other things, and I need an accommodation. No, because she can perform the essential functions of her job as a dialysis technician. She's on her second job after this one. I forget the one she went afterwards, and now she's at OHS. What she did is she took a job at OHSU, the Oregon Health and Sciences University, and she also has another job that she's on call at. And the important thing about individuals with disabilities is that in order to qualify as a person with a disability, one must be able to perform the essential functions of the job. The difficulty with her panic disorder without agoraphobia is that her psychologist and her physician recommended to this employer that they just simply not return her to this particular workplace because it was aggravating her symptoms. And the Code of Federal Regulations, as we pointed out in our reply brief, specifically anticipates, Your Honor, that a job transfer would be an accommodation under the ADA. In this particular case, this employer went out on a limb and they wrote their employee a letter and said, We do not believe that you have a disability without ever meeting with her. And in fact, they did this after having received a report from the psychologist that says, This person has a panic disorder. Here's how she's substantially limited and listed the major life activities. They then conferred with the psychologist. They then wrote the employee a letter saying, We don't think you have a disability. And the psychologist wrote them a letter back saying, I don't think you understand, and again reiterated the problems that she was having with her major life activities. I think where things have kind of gone awry in this case, if I can presume that, is that there's this general notion that if someone can do an activity, that they are not substantially limited, and I think that that is the problem. When we originally looked at handicapped of course, my impression from reading the magistrate judge's opinion in this case is that he believed that she could do the same activities that she could do before. But we're really talking about a substantial limitation. Under the old definition of handicap, we had individuals who were in wheelchairs who could not walk. Now, they could not do that major life activity, but now we're talking about substantial limitation. A person with emphysema can breathe, but they are substantially limited in their ability to breathe. I think you're looking at it a little bit more broadly. I think it's more narrow than that, and that is, is she suffering from a disability if she can do the function, in other words, be a renal technician, but she just can't do it with X being her supervisor? I think those are two different questions. I think someone can have a disability. First of all, in order to have a disability, you must be able to perform the essential functions of the position with or without accommodations. Right. That makes them qualified. Okay. What you're really asking about is the accommodation. In other words, is the accommodation, are they required to give her the accommodation of transferring her somewhere else to an available job? And the answer is clearly yes. Even if it's only a personality problem with a particular supervisor? Well, this is not a personality problem. Well, but then what is it? It's not that there's something, an environmental issue at the Rose Quarter facility. In other words, it's not she's allergic to something there or that when she walks in there, the type of lighting or something causes the reaction. It's the people that she's working for, right? As the court knows, there were a series of events that occurred to Ms. Gomez-Morales, beginning with an event in November of 2003 in which she or actually beginning with events in January, excuse me, beginning with events earlier in 2003 in October in which she was abused by a patient. Then she was threatened by a coworker who they fired, and she was threatened with corrective action, which her then supervisor refused to give to her. That supervisor was then fired for failing to give her the corrective action. When the new supervisor came in, he then imposed the corrective action, and basically she feels like she's been treated unfairly by these supervisors. Now, there is an objective basis for her to have these feelings. It's not a matter of fancy, and it has distilled itself into this panic disorder that she has, which is getting progressively worse. Her physician explained... Doesn't it get worse when she's working for somebody else at a different location? Her physician explained that if she's put it back in contact with these individuals, that the panic disorder will worsen. And the problem with panic disorders is the more you have panic attacks, the more frequently you'll have panic attacks. So it was medically necessary that she not work there. That being the case, I'm sure you're familiar with this, 29 CFR 1630.2J3-I says, the inability to perform a single particular job does not constitute a substantial limitation in the major life activity of working. That is correct. How do you fit that with what your client is alleging? Because her substantial limitations are in other major life activities apart from working. Okay. So it's the sleeping, et cetera, et cetera... Concentration. ...that you'll have to get to in your rebuttal time. And we'll look forward to that. Thank you, Your Honor. Can we now hear from Mr. Volpert, I believe? Please report. The major life activity... Major life activity and limitations here throughout this case was working. And, Your Honor, you hit the nail right on the head when you referred to 29 CFR and the provision you recited. The fact of the matter is that it is undisputed here that as of the time she was released to go back to work in July of 2004, the plaintiff could perform the job of renal technician. She could perform it anywhere in the world. She could perform it except, supposedly, she couldn't perform that particular job if she didn't get a new location and a new supervisor. I want to focus for just a moment on the six-month issue. The employer in this case indicated that there was an internal policy about transferring within the organization. I gather there are at least one, maybe other locations where these dialysis services are performed within this organization. Is that right? Correct. Counsel for the plaintiff, I gather, has taken the position that this was just an informal thing. It wasn't a real policy. Why couldn't the employer have accommodated the plaintiff in this case by moving her to another location within the organization where there would have been a different supervisor? Why would that have been so difficult? Well, in theory, it could have been done, and it doesn't matter how difficult it is. The question here is whether or not the employer was required to grant a transfer. Now, as to the policy, Your Honor, I want to be very clear here. The only evidence in the record is that there was such a policy. There is no evidence to the contrary. There's no written policy. There's just a declaration from one of the employees. Right. There's no written policy, but there's testimony from one of the employees that that was their policy. But putting aside the issue of whether or whether or not there was a policy, the question is not could it have been done. The question is whether the Americans with Disabilities Act requires that it be done. You know, there's nothing actionable about saying if someone says I would like a transfer and someone says you cannot have a transfer. What arguably makes that actionable is if you say, well, wait a minute. The transfer is essentially a reasonable accommodation to which I'm entitled under the ADA. And under the facts of this case, as the magistrate judge pointed out very clearly, there is no requirement under the ADA. Well, but we're talking about requirement and we're also talking about discrimination. Now, if she lost her job because of they were discriminating against her, that would be a different situation. But there's no evidence of discrimination. Well, but let's take up the six-month issue. The first time there clearly was a disciplinary action within six months. But the second time she requested it, don't you you're saying the six months gets told while she's out of work? Well, no, we've got to make sure we're straight here. I think you're talking about in March 2004 she made a transfer request. Right. And she was told at that point in time that I think is that the date, I believe so, that the transfer would not be allowed. And then after she received, the thing that's confusing here is that the request that she's making for accommodation is a transfer request. Right. They are one and the same thing. So you can't confuse the two. I mean, I think in essence I think one thing the district court did wrong was say that a refusal to give a transfer, a lateral transfer is an adverse employment action. And I think that that's the one mistake the district court made because if you're going to say that if the accommodation the employee asks for is a transfer. I'm talking about in the letter dated October 20th, 2004. They offered to return Gammas, your client offered to return Gammas Morales to her previous position at the Rose Quarter at the same salary and benefits. But they refused to transfer again saying that the company had a policy prohibiting transfer of employees with recent disciplinary problems. So if we go back six months, when was the disciplinary, when was the disciplinary problem within the six months? Well, if you say, Your Honor, that I acknowledge that the policy has not been ferreted out such that the scenario would be explained that if she leaves on the day of her last correction notice, takes a family leave, refuses to come back, and then comes back later and asks for a transfer, the policy, the record does not develop such a thing. I mean, I would assume, you know, that while she's on leave, that six months would be told. But I can't tell you that that's laid out clearly in the record. And that's not even in the declaration, right? Right. That's right. But the point here is that the transfer request, there's nothing wrong with denying transfer. And the notion of denying a transfer request when that denial was made, that was exactly the equivalent of saying we will not grant you reasonable accommodation under the ADA. You can call it whatever it is. The transfer request in this case that was made in October 2004 was exactly the same thing that was requested when they said under the ADA can we have accommodation. Yeah, but what we're talking about, we're not here on an appeal from a decision of the jury deciding whether as a matter of law that it should come out a different way. We're saying should this get to a jury? Could a reasonable jury find that there was retaliation? Because you're relying on a policy that's somewhat in the air. Now we're talking about there's nothing in writing but there's a declaration. Now, but there's nothing about the tolling in the declaration. There's nothing in writing about the tolling. And we're saying when she asked in the fall of 2004 for her doctor to come back and get transferred to say, no, we have this policy. It kind of makes me wonder whether they're just saying, hey, no, we're not going to do this. You take time off. I begin to wonder. And then getting back to I don't know what this case cost your client, but it certainly would have been a lot cheaper to transfer her and not be so stubborn. But that's the question of reality versus what the law requires. I think you have to put aside the fact, what if we had never said that the policy applies? What if arguably the person who wrote that letter misinterpreted the policy? The point is still the same. Here's the point. Discrimination for what? The point is that in this case. For exercising her leave. Well, no. In this case, though, the she took her leave and she was still on leave at the time the denial was made. And the thing that's so crucial here and so critical to understand is that in this case, the denial of the transfer is not an adverse employment action. It's a denial of a lateral transfer. And the problem you get into, and we cited cases from other districts that said that and from other circuits, and there's no case in the Ninth Circuit that says that the denial of a lateral transfer is an adverse employment action. But here's the problem. If you get to a position where you say, yeah, that denial of a transfer was an adverse employment action and it was motivated by discrimination because she filed a family leave claim, you see, what happens then is you are basically saying that, okay, you're entitled, let's just say in theory, you're saying, okay, defendant, you're entitled to tell her that she is not disabled under the ADA. And you are entitled, if she is disabled under the ADA, to say that it's not a reasonable accommodation to require somebody to be transferred to a new supervisor. But at the same time, you're saying then the plaintiff can instantly bootstrap that refusal to transfer into a discrimination claim. There's nothing inherently improper about a refusal to make a lateral transfer. The only reason the lateral transfer comes into play here is because that is the accommodation that the plaintiff is requesting. So if they said we're not going to make a lateral transfer because you took time off under the Family Medical Leave Act, you're saying there's nothing wrong with that, they can do that. No, but there's no evidence of any of that. Well, no, no, that's not my question. Because the question is could a jury find that. So if you're saying that if a jury were to find that they didn't transfer her in the fall of 2004 because she took family medical leave, you're saying that's inconsequential as a matter of law. I think that a refusal to grant a lateral transfer, yes, I'm saying that. Because I'm saying that a refusal to grant a lateral transfer is not an adverse employment action. If it's a refusal to promote or consider for promotion. So even if it's in retaliation, you're just saying it's not an adverse action that could constitute. Well, first of all, yes. To answer your question, I think the answer is yes. It would not be enough. But in this case, the point is there's no evidence whatsoever that that was in retaliation. On the other hand, if arguendo, if we were to say that there was, that she was eligible under the ADA for a finding that she was substantially limited in the major life activity of working, just arguendo, say that. And in that setting, if she had requested a transfer, would there have been an obligation to transfer her there as an accommodation? No. I think that there's two layers here, the reason she loses on the ADA. There's two layers. The first is that she's not disabled for the reasons that we've stated. No. And I understand that. I'm just saying arguendo. If you said that she was, I'm asking whether. No. If she is disabled, then the question becomes is transferring to a new supervisor a reasonable accommodation, if I understand what you're asking. Yeah. Correct. And we've cited cases in our brief. Absolutely not. And there's no case that I've ever heard of that has said that a reasonable accommodation can mean allowing the plaintiff to request that they be transferred, basically select their supervisor and select their job location. There are cases of the contrary. We've raised in our brief. The purpose of the ADA, these cases say, is not to allow an individual to rearrange their job circumstances in situations where that's all they're asking for. You have to go back to the fact and realize in this case that this employee could do whatever she wanted. And the issue here is not properly should you grant a transfer. The issue here properly is whether or not a transfer was a proper accommodation under the ADA. Now, there's no evidence in this record, as the district court properly found, of any connection between the denial of the transfer in October 20, 2004 and the fact that she took family leave. The fact of the matter is that she took family leave. And what happened after that? You've got to pay a lot of attention to what happened after that. She took the leave. She was there. She used up her leave. She was allowed to stay there after her leave. She was kept on basically for 18 months from the day that she requested her leave with constant requests from the employer to come back to work. The only thing to do Did she take other employment during that 18-month period? I'm trying to remember. I think she took another full-time job. Yes. I think the answer is yes. We terminated her in September of 2005. I believe that she took a full-time job in February of 2005. Counsel can correct me if I'm wrong. So sometime during that 18-month period where you had accommodated, I don't mean in an ADA sense, but where she was on leave, she took another job. Yes, except now let me be a little bit clearer on that. The leave only lasts 12 weeks. And the cases we cite say that after 12 weeks she has no more rights under the Family Leave Act. I understand. So she went beyond 12 weeks, and then she started asking for accommodations. But the entire time, the Family Leave Act had already gone by. And she, in fact, we were so patient with her. You might ask why were we so patient with her and why did we wait so long? But the fact of the matter is that while she was still on some sort of leave off work, she took another job. That's correct. So I think what the district court is saying is that, you know, you need to look at this and you need to say, well, even if you, let's assume you're going to say, okay, let's say that the employer was angry because she took family leave and therefore, you know, they denied the transfer. I think the district court's position is that no reasonable juror could find that. Everything they did from the date that the family leave was granted forward until the time they finally terminated her was favorable to her, except the employer invoked its right to say you're not entitled to an accommodation of the Americans with Disabilities Act. That's why we're here. And that's why we're here. Can I ask you a question about the defamation? About what? The defamation claims. Basically, with the striking of the declaration about the hearsay sentence, there's no reason for the defamation claim. Correct. I think the magistrate judge was wrong. He used the wrong standard. And I, at one time, was using the wrong standard until I realized that the Ninth Circuit has said that the evidence doesn't have to be admissible under the rules of evidence in a summary judgment motion. It has to be capable of eventually being admitted at trial. And so hearsay statements can be used on declarations in opposition to motions for summary judgment. So I think he was wrong. And the question then becomes, could they have gotten these people to testify at trial? Because if not, then there's nothing worth it here. And so the question is, the first one is, Anna Harris told the plaintiff that Karen Casey, am I pronouncing that right, and Cindy Bain were telling the co-workers that I was fired from drug use. Now, it's only Bain who's still at issue, right? So if Anna Harris could testify at trial, then it would be something that could be used on motion for summary judgment. Would Anna Harris have testified to this at trial? I think, was she the one who said she didn't remember? Your Honor, I'll be honest with you. I don't know the answer to that. I believe she was, but I don't know the answer. What about the second one? And I guess co-counsel will address this. That Karen Casey told the plaintiff, that Cindy Bain told her that I was fired from renal group for drug use. How about Karen Casey? Was she available to testify? The only thing I can recall is I believe the district court said that there were no independent witnesses of this other than the plaintiff in this case. But I'm afraid I don't know the specific answer to your question. But Karen Casey would be an independent witness. She would? She would be an independent witness. Yes, she would. But her deposition was never taken? I apologize. I don't know that. Okay. Very good. Thank you very much, Mr. Volpitz. You have seven minutes for your rebuttal. I'm not Mr. Volpitz here. You're Mr. Snyder. Sorry about that. Thank you, Your Honor. I would just like to briefly address the issue of transfer, please. As we pointed out in our reply brief, the Code of Federal Regulations specifically allow for part-time or modified work schedule reassignment to a vacant position, adjustment or modification of policies and other similar accommodations, and an employer may reassign the individual to an equivalent position if the individual is qualified and the position is available. This company has never claimed that there were not other jobs available. This is the FMLA you're quoting from there? No, the ADA, Your Honor. Okay. So that goes back to the issue of whether or not she in fact was entitled to an accommodation. I'm sorry. I cut you off. Excuse me. No, no. That's okay. In other words, she would have had to have qualified under the ADA in order for what you talked about. Yes. Am I addressing the wrong point? No, no. That's fine. That's fine. I do want to go on to an adjacent point. According to the record, and I'm looking at ER 135, Dr. Diane Kaiser, who was your client's licensed psychologist, stated that your client's symptoms are triggered by the specific job and people at PNRS, and, and I'm quoting, when triggers are absent the symptoms are unlikely to manifest. I think she's talking about the discrete panic attacks. In other words, one can have a panic disorder, which is a continuing condition, and then you can have an incident called a panic attack, which you're probably familiar with. So I think that that is what is being referred to here. You're suggesting that, reviewing the record, that Dr. Kaiser's comments do not deal with the issues of sleep, socializing, taking care of oneself. Those are the other points that you make. Those would be continuing problems. I guess that's my point, because Dr. Kaiser seems to be suggesting that if your client is away from the Rose Quarter and her supervisor, these things will not manifest. Is that incorrect? I think that that is incorrect. I think what she was saying is that if she's away from the Rose Quarter, she would not have a spike of a panic attack. And actually my client addressed in her affidavit the fact that she continues to have these issues with sleeping and memory and concentration, which she hasn't had since she's been away from the Rose Quarter, is a specific panic attack. What are we to make of your client's admissions in her deposition, I gather, that she is able to leave her home, go shopping, attend church, and so on, that seem to be somewhat contradictory of some of the phobias that she's expressed? Thank you. Well, I think that what she was saying in her deposition is initially she was unable to leave her home except to attend medical appointments, and then she did not leave her home as frequently. That she was able to drive, but that she avoided driving. That she was able to answer the phone, but she avoided answering the phone. That she was able to go shopping, but she avoided going to specific locations. I think it's just reality that people that have this sort of avoidance. In other words, she indicated she didn't want to go in the area of the Rose Quarter, where one of her family members was being treated at a hospital for a particular disease because it was in proximity to the workplace. In other words, I think it is – I shouldn't say it is what it is, but I think this is just the particular facts of her case. So is it your position that you're not really focusing so much on the major life activity of working now as you are on the major life activities of sleeping, socializing, taking care of ones? Absolutely, because an individual can have a disability and be able to work. In other words, there are people with major depression who experience all sorts of social avoidance and can show up and work and be your CPA and do a very adequate job. So individuals with these disorders, emotional or mental disorders, are not necessarily precluded from performing their essential work activities. In fact, they are required to do so. If it's permissible, Your Honor, I wanted to talk about some of the cases that dealt with the issue of placing individuals in other jobs. And I would like to, again, emphasize with the Court that the only evidence we had of this policy about not transferring people is simply a statement in a declaration. No policy was ever produced, and there's no evidence that my client ever received such a policy. But there was also – just to be sure that you guys are in agreement – there was also nothing in the record that said there wasn't such a policy. Well? He said it was an oral policy. He didn't know all the parameters, but also made the point that there was nothing in the record saying there wasn't such a policy. I think my client had never heard of this policy until they said, no, you can't have it or you can't do it. Is it a requirement that your client have heard of the policy in order for there to be such a policy legally? Well, you know, I don't know about that, but it certainly indicates, and I think it would indicate in a jury's mind that the policy probably did not exist if it only existed in the mind of the Human Resources Director. The cases that I'd like to talk about, Cripe versus the City of San Jose, which is a Ninth Circuit decision in 201, says that to waive provisions of a transfer policy is not per se unreasonable. And in this particular case, the only transfer policy that they've ever produced was a transfer policy that said that new employees six months were prohibited from being transferred unless they waived it. And they certainly could waive that written policy. And what I'm really concerned about is the failure to engage in the interactive process under Barnett because they never actually sat down with her and said, Janelle, what can we do for you? That never happened. They adopted a combative style and said basically from the correspondence that's been produced, what can we do to avoid accommodating her? And I certainly think that that does not fit the spirit of the law. Thank you, Your Honor. Thank you very much. What about my concerns about the defamation? I'm so sorry, Your Honor. My concerns about the defamation case. How would you prove that at trial? We would call that witness. I do not believe that there's any affidavit or declaration from her asserting that she ---- Well, didn't Anna Harrison at deposition say she couldn't remember the statements? I hope this doesn't sound like a cop-out. This wasn't my case, and I don't know. But I'm wondering because if you can't establish that you could have called these witnesses, then you can't rely upon it in summary judgment. So is Casey still available? Did anyone take her deposition? Is there anything in the record that says she'd otherwise be available? I don't know. I don't think there's anything in the record, but I don't have any reason to believe she's died. But we don't know whether she remembers the statements either. In an ideal world, my associate would have gotten a declaration from her. Okay. What we can agree on is if she's dead, she doesn't remember. Well, not if it's either in the record or not in the record. Thank you, Mr. Snyder, Mr. Volper, for your presentations. The matter just heard will be submitted. We will now hear the case of Martinson v. Pacific Court. Gentlemen, if you'll forgive us, we're going to take a five-minute recess, and then we will return.
judges: Thompson, Smith, Moskowitz